J. H. Schaeffer, Jr., and Opal R. Schaeffer v. Commissioner.
Schaeffer v. Commissioner
Docket No. 61539.
United States Tax Court
T.C. Memo 1957-68; 1957 Tax Ct. Memo LEXIS 182; 16 T.C.M. (CCH) 291; T.C.M. (RIA) 57068; April 30, 1957
*182 Held: The net increase in amounts credited during 1952 and 1953 by finance companies to the "loss reserve" accounts of petitioner, an accrual basis automobile dealer, was taxable income to petitioners in the years that the increases occurred. Tom Mitchell, Jr., Esq., 128 North Court Avenue, Memphis, Tenn., for the petitioners. James R. Harper, Jr., Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in petitioners' income tax and additions to tax for the years 1952 and 1953 as follows: Addition to Tax
Year
Deficiency
Sec. 294(d)(2)
1952
$ 8,191.10
$ 555.72
1953
25,399.22
1,677.75
Certain adjustments have not been contested and certain other adjustments have been stipulated. The additions to tax imposed under section 294(d)(2) of the Internal Revenue Code of 1939 are not contested except to the extent based upon the adjustments contested by petitioners. The only issue is whether respondent correctly determined that the net increases in certain amounts withheld by finance companies as security in purchasing automobile notes and contracts from petitioner J. *183 H. Schaeffer, Jr., and credited to his "loss reserve" accounts were taxable income to petitioners in the year that such increases occurred. Findings of Fact The stipulated facts are so found, and are incorporated herein by this reference. Petitioners are residents of Germantown, Tennessee. They filed joint Federal income tax returns for the taxable years with the director of internal revenue for the district of Tennessee. Petitioner J. H. Schaeffer, Jr. (hereinafter referred to as petitioner) operated a retail used automobile business as an individual proprietor during 1952 and 1953 under the trade name of J & S Motors. The books and accounts of the business were kept on an accrual basis. This business was operated during part or all of 1952 and 1953 at 1445 South Trezevant Street, 729 Union Avenue, 3374 Summer Avenue, and at other lots located in Memphis, Tennessee, and elsewhere. In the normal course of operation of J & S Motors, petitioner sold notes executed by purchasers of automobiles under conditional sales contracts to banks and finance companies. Certain notes executed by such purchasers were sold during 1952 and 1953 by petitioner without recourse on petitioner to *184 Memphis Bank & Trust Company and to Guardian Discount Company, both of Memphis, Tennessee. Memphis Bank & Trust Company and Guardian Discount Company are separate corporations but are closely related to each other in organization, operation, and business practices. The two corporations have the same principal place of business and are authorized to and do engage in the same financing and banking businesses. The same individuals own stock in both corporations and in many instances the same individuals are officers, directors, employees or agents of both corporations. During 1952 and 1953 whenever notes, executed by purchasers of automobiles from J & S Motors and secured by conditional sale contracts on such automobiles, were purchased from J & S Motors by Memphis Bank & Trust Company or Guardian Discount Company, certain payments were made to J & S Motors and certain reserves were withheld and credited to two separate and distinct reserve accounts on the books of the company purchasing such notes. These reserves were identified on such books as "loss reserve" accounts and "special reserve" or "rebate" accounts. Amounts credited to the "special reserve" or "rebate" accounts of *185 J & S Motors were payable to J & S Motors on or about the first day of the month following the month during which such credits were recorded. Such payments were regularly made to J & S Motors for each month through September 1952. By an agreement between J. H. Schaeffer, Jr., and both Memphis Bank & Trust Company and Guardian Discount Company, effective on or about October 1, 1952, amounts otherwise payable to J & S Motors out of the "special reserve" or "rebate" accounts were accumulated as additional security against possible losses on notes purchased from J & S Motors. During all of 1952 and 1953 amounts credited to the "loss reserve" accounts of J & S Motors on the books of Memphis Bank & Trust Company and/or Guardian Discount Company were held as security against losses on notes purchased from J & S Motors. The "loss reserve" accounts were chargeable with any and all losses and costs incurred in the collection of notes purchased from J & S Motors. In a typical transaction involving J & S Motors and one of the finance companies, a credit statement would first be obtained from the customer and submitted to the finance company. If the purchaser's credit was satisfactory, J & *186 S Motors made out a bill of sale indicating who held the lien on the automobile and informing the purchaser where payments were to be made. The purchaser would sign a conditional sales contract and make a down payment, consisting of a trade-in or cash or both. This procedure is illustrated by a bill of sale dated July 26, 1952, which recorded a transaction between William G. Smith and J & S Motors as follows: Cash price
$833.00
Net trade-in allowance
228.00
Cash on delivery
60.00
Total down payment
288.00
To finance
545.00
Sales tax
6.90
Insurance cost
100.07
Finance charges
195.53
Total time balance
840.60
Upon completion of a sale, J & S Motors would take the conditional sale contract to the finance company, pay off any "floor plan" indebtedness on the automobile and receive from the finance company a check for the contract. In the transaction involving Smith, Memphis Bank & Trust Company reflected the purchase of the conditional sale contract as follows: Notes Receivable, William G. Smith
$840.60
Cash, payment to J & S Motors
$545.00
Cash, payment of insurance premium
100.07
Loss reserve, J & S Motors
24.23
Special rebate, J & S Motors
113.33
Income
57.97
*187 The books of J & S Motors did not reflect the reserves as income. The only amount recorded as income from the sale of an automobile was the price of the car, as if cash had been paid. The transaction involving Smith was reflected on the books of J & S Motors as follows: Cash, down payment made by
Wm. G. Smith
$ 60.00
Receivable from Memphis Bank
& Trust Co.
545.00
Used car taken as trade-in, at
wholesale value
195.00
Adjustment, to reflect trade-in
at cost
33.00
Sales
$833.00
The agreements between petitioner and Memphis Bank & Trust Company and Guardian Discount Company reflecting the rights and obligations of the parties with respect to the 78special reserve" or "rebate" accounts and the "loss reserve" accounts provided as follows: "MEMPHIS BANK & TRUST COMPANY, 10 South Second St., Memphis 3, Tennessee
"November 30, 1951 "John Alden Parsons President "J & S Motors, 215 North Cleveland, Memphis, Tennessee
"Gentlemen: "Confirming our conversation, we will buy from you certain acceptable notes secured by Conditional Sales Contracts, or other title retention or lien instruments, hereinafter called notes, acquired by you from purchasers *188 at retail of new and used passenger or commercial automobiles, hereinafter called cars, on a non-recourse plan. In such transactions we will expect you to use the rate charts issue by us from time to time for use in your territory. "On all such notes we will set up for your account during the month in which the notes are purchased, reserves as previously agreed upon. No reserve will be set up on unpaid balances under $100.00. Each month we will pay you from such reserves the amount set up in the special reserve account the preceding month, and as of January 1, 1952 and quarterly thereafter, we agree to pay to you from the remainder all over 4% of your outstandings. No payment of any amounts from the reserve will be made as long as any indebtedness you may owe us on any transaction is due and unpaid at the time the reserve payment is to be made. "You are, of course, in a much better position to protect yourself agains losses as to cars repossessed by us by buying said cars from us at the unpaid balance, less refund or unearned finance charges, but as to any such repossessed cars which you do not desire to repurchase we will sell them and charge any loss resulting therefrom to your *189 regular reserve account. "You will be protected against loss resulting from conversion by purchaser of car or confiscation by public authorities on all notes purchased by us under non-recourse plan covered by this letter, or on notes purchased by us with repurchase agreement on your part, if we are unable to obtain possession of the car within ninety days after default of the firstmaturing installment remaining unpaid at the time of repossession. "The provisions as to conversion and confiscation are not applicable to notes purchased by us from you with your unqualified endorsement thereon. "The plan outlined in this letter does not, of course, apply to any past transactions, and can be cancelled by either you or us as to future transactions on written notice from one to the other. This letter cancels all past agreements as to future transactions. "Sincerely yours, "(Sgd.) E. N. McConnell "E. N. McConnell "ACCEPTED: Nov. 30, 1951 DATE "J & S MOTORS - CLEVELAND AVENUE "BY (Sgd.) Joe H. Schaeffer" "MEMPHIS BANK & TRUST COMPANY, 10 South Second St., Memphis 3, Tennessee
"November 30, 1951 "John Alden Parsons President "RETAIL RESERVE AGREEMENT "J & S MOTORS *190 - CLEVELAND AVENUE AND MEMPHIS BANK & TRUST COMPANY
"In our letter of November 30, 1951, concerning our retail agreement with you, the first sentence in the second paragraph refers to a verbal understanding that we have had concerning the amount of the reserve to be set up and the way it is to be paid. Our understanding is as follows: "On 12 month contracts we will retain 6% per annum of cash advance, plus insurance. We will set up in a loss reserve 2% of the cash advance. The remainder will be rebates. On contracts financed for a longer period of time, the same agreement will apply on a proportionate basis. In any transaction we will retain a $20.00 minimum charge. The loss reserve will be payable quarterly all over 4% of the outstandings. "MEMPHIS BANK & TRUST COMPANY
"BY (Sgd.) E. N. McConnell "J & S MOTORS - CLEVELAND AVENUE "BY (Sgd.) Joe H. Schaeffer" "GUARDIAN DISCOUNT COMPANY, 10 South Second St., Memphis 3, Tennessee
"May 5, 1953 "John Alden Parsons President "RETAIL RESERVE AGREEMENT AMENDED April 17, 1953 "J & S Motors - 215 N. Cleveland "In our letter of November 30, 1951 concerning our retail reserve agreement with you, the first sentence in the second *191 paragraph refers to a verbal understanding that we have had concerning the amount of the reserve to be set up and the way it is to be paid. Our understanding is as follows: "On 1949 and later models, we will retain 6% per annum of the cash advance plus insurance. On 1946, '47 and '48 models, we will retain 7% per annum of the cash advance plus insurance. A loss reserve of 6% of the cash advance will be set up. The remainder will be rebate. A filing fee of $1.00 will be set up on all deals. On all transactions, we will retain a $20.00 minimum charge. The maximum rebate on any one deal is $100.00 with the overage being divided equally between rebate and loss reserve. The loss reserve is payable quarterly all over 4% of the outstandings. "Relative to pre-war automobile contracts, there will only be fire and theft insurance placed on these automobiles. The collision premium is added to our charges and we will, in turn, protect your reserve against any loss due to a collision. No rebate will be paid on pre-war cars but will be placed in your loss reserve account. "GUARDIAN DISCOUNT COMPANY "BY (Sgd.) Boyd H. Webb "J & S Motors - 215 N. Cleveland "BY (Sgd.) Joe H. Schaeffer, *192 Jr." J & S Motors had no written agreement with Guardian Discount Company prior to May 5, 1953. However, because Memphis Bank & Trust Company and Guardian Discount Company were guided by the same people, J & S Motors considered that an agreement with Memphis Bank & Trust Company pertained also to Guardian Discount Company and was binding on both. There was no difference in the rates or conditions under which purchases of notes were made or in the manner in which reserves were held by both companies. In 1953, as a result of a decline in the used car market, Memphis Bank & Trust Company changed the method of discounting paper and increased the amount allocable to the loss reserve. This change was reflected in the retail reserve agreement entered into by petitioner and Guardian Discount Company, and was considered binding on both companies. Under the agreements, the amounts withheld and credited to the loss reserve accounts were usually 2% of the notes. However, the percentage withheld varied in amount with the model of the car, and a larger percentage was withheld on older models. Both the Guardian Discount Company and the Memphis Bank & Trust Company were making current entries *193 in a loss reserve account of J & S Motors. There was no allocation of the business of J & S Motors as between the two organizations, but Memphis Bank & Trust would handle the business for a period of time and then the business would be turned over to Guardian Discount Company. The entries kept by both companies showed increases in the loss reserve account which represented a certain percentage of cash advanced on the automobile notes discounted, and decreases in the loss reserve which represented repossession losses. The two financing institutions could purchase notes from J & S Motors promptly and in large volume only if the loss reserves withheld were sufficiently adequate in size to protect the finance companies from the varying market conditions during 1952 and 1953. Thus, the balances in the loss reserve accounts were designed to give the financing institutions protection from losses due to the high ratio of repossessions in the used car field. To provide for such repossessions, the financing companies wished to keep the loss reserves as near to 4 per cent of outstanding notes as possible. In addition, there was a verbal agreement between the financing companies and petitioner *194 that J & S Motors would further guarantee the companies against loss by repurchasing repossessed cars from them at a fair retail price. The balances in the loss reserve accounts of J & S Motors on the books of Memphis Bank & Trust Company did not at any time during 1952 or 1953 exceed 4 per cent of the outstanding value of or amount payable on notes purchased from J & S Motors by such company. The balances in the loss reserve accounts of J & S Motors on the books of Guardian Discount Company did not at any time during 1952 or 1953 exceed 4 per cent of the outstanding value of or amount payable on notes purchased from J & S Motors by such company. During 1952 and 1953 petitioner did not receive any of the loss reserves credited on the books of the finance companies. However, if all of the purchasers of automobiles whose notes were held by the financing companies had met their payments on time, J & S Motors was entitled to receive the entire balances in the accumulated loss reserve account. On their income tax returns for 1952 and 1953 petitioners took deductions for bad debt losses in determining the net profit of J & S Motors. Part of the bad debt losses was made up of losses on *195 repossessions under contracts which had been financed directly with J & S Motors and which had not been discounted to a finance company. In these cases, when a purchaser failed to pay out the obligation, J & S Motors credited its accounts receivable for the outstanding amount due. When the repossessed car was sold, the difference between the amount realized and the amount due represented a bad debt loss and was treated as such on the books of J & S Motors. In these situations, the full sales price of the automobile was included in income. Bad debt losses were not deducted until there was a default on a contract, a repossession, and a subsequent sale which did not realize an amount sufficient to pay off the outstanding amount due. In the statutory notice of deficiency addressed to petitioners and dated December 28, 1955, respondent determined that petitioners were liable for income tax on an item identified as "finance charge income" from October 1, 1952, through December 31, 1952, in the amount of $12,861.88, which is computed as follows: Total accumulated in "Special Re-
serve" or "Rebate Accounts" of
J & S Motors on books of Memphis
Bank & Trust Co. and/or Guardian
Discount Co. from Oct. 1, 1952
through Dec. 31, 1952
$ 6,614.85
Net increase in "Loss Reserve" ac-
counts of J & S Motors on books of
said companies during 1952
4,064.29
Balance in "Loss Reserve" accounts
of J & S Motors on books of said
companies from prior years brought
forward as opening balance in such
"Loss Reserve" accounts on Janu-
ary 1, 1952
2,268.74
Balance in all reserve accounts of
J & S Motors on said companies'
books on December 31, 1952
$12,947.88
Less: Item improperly credited in
1953 per respondent's statement
86.00
$12,861.88
*196 Petitioners accept respondent's determination that the amount of $6,614.85 accumulated in the "special reserve" or "rebate" accounts of J & S Motors on the books of Memphis Bank & Trust Co. and/or Guardian Discount Company before December 31, 1952, represents income taxable to petitioners in 1952. Respondent also determined that petitioners were liable for income on "finance charge income" during 1953 in the amount of $39,380.43 computed as follows: Total accumulated in "Special Re-
serve" or "Rebate" accounts of
J & S Motors on books of Memphis
Bank & Trust Co. and/or Guardian
Discount Co. during 1953
$28,150.48
Net increase in "Loss Reserve" ac-
counts of J & S Motors on books of
said companies during 1953
8,481.95
Balances from prior years in "Loss
Reserve" accounts of J & S Motors
on such books on January 1, 1953,
included in respondent's statement
as increases during 1953
2,662.00
Item improperly credited per respond-
ent's statement in 1953
86.00
$39,380.43
Petitioners accept respondent's determination that the amount of $28,150.48 accumulated in the "special reserve" or "rebate" accounts of J & S Motors on the books of Memphis Bank *197 & Trust Company and/or Guardian Discount Company during 1953 represents income taxable to petitioners in 1953. Respondent concedes that for the years 1952 and 1953 the balances in the loss reserve accounts brought forward from prior years ($2,268.74 for 1952 and $2,662.00 for 1953) are not taxable. Only the amounts representing the net increases in the loss reserve accounts of J & S Motors on the books of Memphis Bank & Trust Company and Guardian Discount Company during the taxable years are in issue. Opinion The sole question here is whether the facts of this case bring it within the rule consistently followed by this Court that amounts credited by a financing institution to the "dealer's reserve" account of an accrual basis automobile or trailer dealer are income to the dealer in the year credited. See Shoemaker-Nash, Inc., 41 B.T.A. 417 (1940); Blaine Johnson, 25 T.C. 123, revd. (C.A. 4 1956), 233 Fed. (2d) 952; Albert M. Brodsky, 27 T.C. 216; Texas Trailercoach, Inc., 27 T.C. 575, (on appeal C.A. 5); West Pontiac, Inc., 27 T.C. - (Jan. 31, 1957). Our examination of the facts compels the conclusion that this *198 case falls within the above rule. The amounts credited to the "loss reserve" accounts of J & S Motors were designed to protect the finance companies from the high ratio of repossession losses which occurred in theused car market, and were therefore used primarily to discharge obligations of petitioner to the finance companies. Furthermore, the loss reserves over 4 per cent of outstanding notes was payable to petitioner and petitioner was entitled to the entire balance of the loss reserve accounts if and when all of the outstanding notes were liquidated. These facts were brought out at the hearing in the following colloquy between an officer of the finance companies and the Court: "THE COURT: * * * suppose every one of the purchasers of automobiles whose paper is purchased by the bank met all of their payments on time, what would happen to the accumulation of such items which you have marked as loss reserve? * * *
"THE WITNESS: Yes, sir; each 90 days we would pay to the dealer all that has accumulated in this reserve account over four per cent of his outstandings. "THE COURT: If he went out of business, he would get it all; is that correct? "THE WITNESS: Not until all of *199 our paper was liquidated. "THE COURT: When he has quit dealing with you, he has gone out of business and is selling no more cars, and all of the purchasers have paid up all of their payments due on those cars, then the total amount of that so-called loss reserve is returned by you to J & S? "THE WITNESS: Yes, sir, if that is the situation." Since the loss reserves were to be used for petitioner's benefit in these three ways, petitioner's right to receive the amounts contained in the loss reserves became fixed when the sums were credited to the J & S Motors account. West Pontiac, Inc., supra. Petitioners point out that at no time during 1952 or 1953 did the loss reserve accounts exceed 4 per cent of the value of outstanding notes, and argue that there may never be any excess payable to them because of the high ratio of repossession losses chargeable to the reserve. In West Pontiac, Inc., supra, concerning a similar argument, we said: "* * * But this contingency did not affect petitioner's original right to receive the amounts accrued in the reserve. If the reserve account was reduced as a result of a repossession loss, the question would be that 'of the deduction which may *200 be taken according to the applicable statute,' and not whether the reserve was returnable as gross income at all. Spring CityFoundry Co. v. Commissioner, supra. [292 U.S. 182]. Cf. Josef C. Patchen, 27 T.C. 592". * * * In the present case petitioners took bad debt deductions in determining the net profit of J & S Motors for 1952 and 1953. Part of these deductions resulted from losses due to repossessions under contracts which J & S Motors itself had financed. In these instances, the full sales price of the automobile sold was included in income and any subsequent repossession loss was deducted from income. In contracts which were discounted to the finance companies, however, the amounts credited to the loss reserve accounts were not included in income on the books of J & S Motors, but the amount of the loss reserve was decreased by the amount of repossession losses. The latter practice was clearly inconsistent with the former. In Texas Trailercoach, Inc., supra, we said: "We fail to see where there should be any difference in accruing the full sale price of trailers [or automobiles] where petitioner intended to handle the paper itself *201 and in instances where petitioner intended to assign the paper to Finance Co. In each instance there was a sale and it seems to us that the full amount of the sales price must be accrued." What was said there is applicable here. In any event, the question of deductibility of repossession losses has no bearing on the issue whether the amount of the loss reserve account is taxable income in the year of accrual. West Pontiac, Inc., supra. Among the authorities cited by petitioner is Johnson v. Commissioner, (C.A. 4, 1956), 233 Fed. (2d) 952, in which a view contrary to the holding herein was expressed by the Circuit Court of Appeals. With due deference to that Court, we nevertheless feel compelled to adhere to our previous decisions, and we therefore respectfully decline to follow Johnson v. Commissioner, supra. It is noted that respondent has included in petitioners' taxable income only the net increases in the loss reserve accounts. To the extent losses actually occurred and were charged against the loss reserve accounts, they have been allowed. Accordingly, we hold that respondent did not err in including in petitioners' income for the years 1952 and *202 1953 the net increase in amounts credited in those years to the loss reserve accounts of J & S Motors. Decision will be entered under Rule 50.